# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**THE OHIO WILLOW WOOD COMPANY,**

        **Plaintiff,**

    **v.**

**ALPS SOUTH, LLC,**

        **Defendant.**

**and**

**ALPS SOUTH, LLC,**

        **Plaintiff,**

    **v.**

**OHIO WILLOW WOOD COMPANY,** *et al.*,

        **Defendants.**

**Case No. 2:05-CV-1039 and 2:09-CV-1027**
**Judge Algenon L. Marbley**
**Magistrate Judge Terence P. Kemp**

## OPINION AND ORDER

This is a patent infringement case involving Plaintiff The Ohio Willow Wood Company ("OWW") and Defendant Alps South, LLC ("Alps"). Before the Court are Alps' Motions for Summary Judgment on the Issue of Collateral Estoppel (ECF Nos. 79, 252) and Alps' Motion for Partial Summary Judgment on Absolute Intervening Rights Pursuant to 35 U.S.C. §§ 307 and 252 (ECF No. 247).[1] Alps contends that collateral estoppel applies to OWW's patent infringement claims in light of the United States District Court for the Eastern District of Texas'

---

[1] Alps filed document ECF No. 79 in case number 2:09-cv-1027. It filed ECF Nos. 247 and 252 in case number 2:05-cv-1039. Record citations will refer to documents in case number 2:05-cv-1039 unless otherwise noted.

decision in *Ohio Willow Wood Co. v. Thermo-Ply, Inc.*, No. 9:07–CV–274, 2009 WL 6499349 (E.D. Texas Nov. 20, 2009) ("*Thermo-Ply*").  Additionally, Alps maintains that OWW amended, and substantially changed, its patent claims during reexamination before the United States Patent and Trademark Office ("USPTO"), which concluded on December 13, 2011.  Accordingly, Alps asserts that under the doctrine of absolute intervening rights OWW is not entitled to damages prior to December 13, 2011.  For the reasons that follow, Alps' Motions for Summary Judgment on the Issue of Collateral Estoppel are **DENIED**.  Alps' Motion for Partial Summary Judgment on Absolute Intervening Rights Pursuant to 35 U.S.C. §§ 307 and 252 is **GRANTED**.

## I. Background

OWW is the owner of U.S. Patent No. 6.964,688 ("the '688 patent"), entitled "Tube Sock-Shaped Covering."  The USPTO issued the '688 patent, the invention of Bruce G. Kania, on November 15, 2005.  The patent describes coverings for amputees which facilitate the attachment of the amputee's residual limb to a prosthetic.  In general terms, the relevant specifications and claims describe a covering, in the shape of a tube sock, coated on the inside with gel.  The gel forms an air-tight seal with the amputee's residual limb.  The device has an open end for introduction of the limb and a closed—or distal—end opposite the open end.

On November 16, 2005, OWW brought this action for patent infringement against Alps. Initially, OWW maintained that Alps was infringing on claims 1, 2, 8, 10–13, 16–19, 23, 26, 27, 28, 50, 51, 54–56, 60. 62–66, 67, and 69 of the '688 patent.  (First Am. Compl. ¶ 70, ECF No. 6.)  Of particular importance to the current dispute, independent claim 2 of the '688 patent originally read:

> A tube-shaped covering for enclosing an amputation stump, said covering comprising fabric coated on the inside thereof with polymeric material capable of

2

forming an air-tight seal with a limb of a wearer when said covering is donned, and docking means for attachment of an external device to the said covering, said covering configured to have an open end for introduction of said stump and a closed end opposite said open end.

U.S. Patent No. 6.964,688 col. 22 ll. 11–19 (filed Oct. 15, 1999) (issued Nov. 15, 2005).

Dependent claim 10 originally described "[a] tube-shaped covering according to claim **2**, wherein said docking means is incorporated by attachment of an adapter to the outside of said covering." *Id.* at col. 22 ll. 65–67 (emphasis in original).

The '688 patent specification provided the following discussion regarding docking means and adapters:

> [T]he invention cushion locking liner comprises docking means for attaching an external device, etc. to the liner. Such docking means included pins, cables, straps, . . . snaps, buckles, buttons, etc. and are typically those which help attach and support a prosthetic device. Some of these docking means are known in the art and are preferably incorporated in the cushion locking liner by means of direct molding, meaning the molding of an adapter into the fabric. . . . Such docking means, including distal inserts, can be centered or can be offset to accommodate individual residual limb geometries. Other docking means include molding a raised configuration in the side of the liner which then mates with a recess on the inside of the prosthetic socket . . . .

*Id.* at col. 9 ll. 9–26. Additionally, the specification described:

> Another object of the present invention is a cushion locking liner similar to the invention cushion liner but having docking means preferably at the distal end or side thereof for coupling the liner to, e.g., the hard socket of a prosthetic device. The docking means are preferably molded directly into the cushion liner.

*Id.* at col. 3 ll. 40–45.

On October 5, 2006, Dr. Aldo A. Laghi, President of Alps, requested that the USPTO conduct an *ex parte* reexamination of the '688 patent. The USPTO granted this request on

3

December 1, 2006.  The Court stayed this action pending the reexamination process.[2]  During the

reexamination process, OWW amended several of the independent claims of the '688 patent to

emphasize differences between the patent and prior art.  The amendments indicated that the

polymeric material referred to in the '688 patent resided only on the inside surface of the

covering.  For example, claim 2 was ultimately amended to read:

> A tube-shaped covering for enclosing an amputation stump, said covering comprising fabric coated on [the] *only an* inside *surface* thereof with polymeric material capable of forming an air-tight seal with a limb of a wearer when said covering is donned, and docking means for attachment of an external device to the said covering, said covering configured to have an open end for introduction of said stump and a closed end opposite said open end.

(Mot. Summ. J. Intervening Rights Ex. 1, ECF No. 247-1) (reexamination certificate issued Jan.

13, 2009) (deletions from patent appearing in brackets, additions appearing in italics).  On

January 13, 2009, the USPTO issued a reexamination certificate determining that the claims in

question were patentable in light of OWW's amendments to the independent claims.  (*Id.*)

In February 2009, the Court vacated its previous stay.  From April 27 to May 1, 2009 the

Court conducted a hearing concerning OWW's Motion for a Preliminary Injunction.  The Court

ultimately denied this Motion on September 8, 2009.  On November 13, 2009, Alps brought a

separate action, case number 2:09-cv-1027, against OWW and Mr. Kania raising antitrust and

Lanham Act claims.  The Court consolidated Alps' action with OWW's lawsuit, case number

2:05-cv-1039, on March 29, 2011.

---

[2] During the stay, Dr. Laghi made additional requests for reexamination.  The USPTO granted these requests and consolidated the reexamination proceedings.

## A. The *Thermo-Ply* Litigation

During the pendency of this action, OWW was prosecuting a separate patent infringement lawsuit against Thermo-Ply, Inc., alleging infringement of Patent No. 7,291,182 ("the '182 patent"). Mr. Kania also invented the '182 patent. The '182 patent involved a similar invention, a prosthetic liner coated with gel. Claim 1 of the '182 patent, at dispute in *Thermo-Ply*, specifically provided:

> A cushion liner for enclosing an amputation stump, said liner comprising a fabric covering having an open end for introduction of said stump and a closed end opposite said open end, said fabric coated seamlessly on only an inside surface thereof with a polymeric cushioning gel that substantially conforms to the shape of said amputation stump when said liner is worn; wherein said liner is configured such that said polymeric cushioning gel is in contact with the skin of said amputation stump when said liner is worn by a user thereof.

Patent No. 7,291,182, col. 14 ll. 7–16 (filed July 23, 1998). Thermo-Ply moved for summary judgment contending that OWW's asserted claims of the '182 patent were invalid as obvious pursuant to 35 U.S.C. § 103(a).[3]

On November 20, 2009, the *Thermo-Ply* court granted summary judgment, holding that all of the asserted claims of the '182 patent were invalid as obvious in light of prior art. In reaching this determination, the court focused on two pieces of prior art, the Silosheath and

---

[3] 35 U.S.C. § 103(a) provides:

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

Patent No. 4,923,474 ("the Klassan patent").[4]  The court described the Silosheath as "shaped like an athlete's tube sock [that] goes over an amputee's stump.  It is made of fabric, which is coated on the inside with gel."  *Thermo-Ply*, 2009 WL 6499349, at *2.  As the *Thermo-Ply* court highlighted, Mr. Kania testified that the Silosheath had played a role in his invention of the cushion liner that the '182 patent describes.  *Id.*  The Klassan patent describes a "sleeve" made of an airtight "elastic material" designed for enclosing "a body part, such as an amputation stump."  Patent No. 4,923,474 col. 8 ll. 13–24 (filed Jun. 25, 1987).  The *Thermo-Ply* court also discussed the ICECROSS, the commercial embodiment of the Klassan patent, in considering whether the claims of the '182 patent were obvious.

In *Thermo-Ply* the court first found that the independent claims of the '182 patent at issue were obvious over the combination of the Silosheath and the Klasson Patent.  2009 WL 6499349, at *2–8.  In the *Thermo-Ply* proceedings, OWW contended that neither the Silosheath nor other prior art taught a covering that is coated with gel on only one side without bleed-through.  *Id.* at *3.  The *Thermo-Ply* Court recognized that "there is no question that a thin layer of bleed-through is evident" on the Silosheath.  *Id.* at 3.  The court held, however, that the use of an impermeable fabric to prevent bleed-through was "not sufficiently unpredictable to create a patentable invention."  *Id.* at *6.  The court further concluded that other potential differences between the prior art and the independent claims were obvious.  *Id.* at *2–8.

The *Thermo-Ply* court also found that the various dependent claims of the '182 patent were obvious.  2009 WL 6499349, at *8–10.  The dependent claims fell into several categories

---

[4]  The *Thermo-Ply* court also briefly considered Patent No. 5,258,037 in determining that certain dependent claims of the '182 patent—concerning the thickness of the gel—were obvious. 2009 WL 6499349 at *8.

including "docking means" claims and "molded docking means" claims. *Id.* at *8. The docking means claims recited "a fabric cover comprising a docking means at the distal end" and the molded claims required "that the docking means be molded to fabric on the exterior of the liner." *Id.* at *9. The court determined that all of these dependent claims simply employed known techniques and were, therefore, obvious. *Id.*

OWW appealed the district court's invalidity determination to the United States Court of Appeals for the Federal Circuit. On December 7, 2011, the Federal Circuit, in a summary decision, affirmed the district court. *Ohio Willow Wood Co. v. Thermo-Ply, Inc.*, 440 F. App'x 926 (Fed. Cir. 2011).

## B. December 13, 2011 Reexamination

On January 20, 2009, Dr. Laghi requested an additional *ex parte* reexamination of the '688 patent, which the USPTO granted on April 7, 2009. In November 2009, a USPTO examiner issued a communication rejecting claims 1-13, 15-32, 34-51, and 53-71. (Mot. Summ. J. Intervening Rights Ex. 6 at 1, ECF No. 247-6.) Following this communication, OWW amended each of its independent claims to include the requirement of "*an adapter secured to said fabric at said closed end of said covering, said adapter for coupling said covering to a socket portion of a prosthesis*." (Mot. Summ. J. Intervening Rights Ex. 2, ECF No. 247-2) (reexamination certificate issued Dec. 13, 2011) (emphasis in original). For example, OWW amended claim 2 to read in full:

> A tube-shaped covering for enclosing an amputation stump, said covering comprising fabric coated on only an inside surface thereof with polymeric material capable of forming an air-tight seal with a limb of a wearer when said covering is donned, [and docking means for attachment of an external device to said covering,] said covering configured to have an open end for introduction of said stump and a closed end opposite said open end, *and an adapter secured to said fabric at said*

7

> *closed end of said covering, said adapter for coupling said covering to a socket*
> *portion of a prosthesis.*

(*Id.* (deletions from patent appearing in brackets, additions appearing in italics).)  On October 24, 2011, the USPTO issued its "Statement of Reasons for Patentability and/or Confirmation." (Mot. Summ. J. Intervening Rights Ex. 5, ECF No. 247-5.)  In confirming the patentability of the amended '688 patent claims, the examiner emphasized that "neither the Silosheath or Klasson specifically disclose securing an adaptor attached or secured to the gel."  (*Id.* at 2.)  On December 13, 2011, the USPTO issued a reexamination certificate determining that the claims in question were patentable in light of OWW's amendments.[5]  (Mot. Summ. J. Intervening Rights Ex. 2, ECF No. 247-2)

Following the USPTO's December 13, 2011 reexamination determination, OWW filed its Second Amended Complaint.  (ECF No. 242.)  OWW now maintains that Alps is infringing the claims of the '688 patent, including claims 1, 2, 4–9, 11–13, 16–29, 35, 38–42, 48, 50, 51, 55–69.  (*Id.* at ¶ 114.)  Alps subsequently filed the Motions for Summary Judgment currently before the Court.

## II.  Standard

A motion for summary judgment should be granted only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Summary judgment on a claim or issue "will not lie if the . . . evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In considering a motion for

---

[5]  OWW also added a new claim, number 72, which the USPTO found to be patentable. (Mot. Summ. J. Intervening Rights Ex. 2, ECF No. 247-2.)

summary judgment, a court must construe the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The movant has the burden of establishing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993).

A genuine issue of material fact exists "when there is sufficient evidence for a trier of fact to find for the non-moving party." *La Quinta Corp. v. Heartland Props. LLC*, 603 F.3d 327, 335 (6th Cir. 2010) (internal quotations omitted); *see also Westco Group, Inc. v. K.B. & Assocs.*, 128 F. Supp. 2d 1082, 1085 (N.D. Ohio 2001) ("A factual dispute precludes summary judgment only if it is material, that is, if it relates to a matter essential to adjudication.") To survive summary judgment, the nonmoving party must present "significant probative evidence" to show that there is more than "some metaphysical doubt as to the material facts." *Moore v. Philip Morris Co.*, 8 F.3d 335, 339–40 (6th Cir. 1993).

### III. Analysis

As noted above, Alps seeks summary judgment on two separate grounds. First, Alps contends that collateral estoppel applies to OWW's patent claims based on the invalidity determinations of the *Thermo-Ply* court. Alps stresses that pursuant to *Blonder-Tongue Lab., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313 (1971) ("*Blonder-Tongue*") collateral estoppel applies because the unadjudicated claims of the '688 patent raise the same validity issues as the claims adjudicated in *Thermo-Ply*. OWW, on the other hand, maintains that the claims of the '688 patent raise different issues than the claims adjudicated in the *Thermo-Ply* litigation, making collateral estoppel inappropriate.

9

Second, Alps contends that it is entitled to partial summary judgment based on the doctrine of absolute intervening rights. Specifically, Alps contends that the amendments OWW made during the last reexamination process substantially changed the scope of OWW's claims.[6] Accordingly, Alps contends that the doctrine of absolute intervening rights bars any infringement damages occurring prior to December 13, 2011. OWW concedes that it altered the scope of some of its patent claims during the reexamination process. Nevertheless, OWW asserts that amended independent claim 2 is identical in scope to prior dependent claim 10.

## A. Collateral Estoppel

Because general principles of collateral estoppel are "procedural issue[s] not unique to patent law" the Court applies "the law of the regional circuit," here the Sixth Circuit. *Abbott Lab. v. Andrx Pharm., Inc.*, 473 F.3d 1196, 1202 (Fed. Cir. 2007). Collateral estoppel requires the following elements:

> (1) the precise issue raised in the present case must have been raised and actually litigated in the prior proceeding; (2) determination of the issue must have been necessary to the outcome of the prior proceeding; (3) the prior proceeding must have resulted in a final judgment on the merits; and (4) the party against whom estoppel is sought must have had a full and fair opportunity to litigate the issue in the prior proceeding.

*Pfeil v. State Street Bank & Trust Co.*, 671 F.3d 585, 601 (6th Cir. 2012). The party moving for collateral estoppel has the burden of establishing these four elements. *Id.*

In *Blounder-Tongue*, the United States Supreme Court established that, through collateral estoppel, a determination of the invalidity of a patent in one action could render the same patent

---

[6] Alps maintains, in the alternative, that the amendments made during the earlier reexamination process also constitute a substantive change, barring damages to the amended claims prior to January 13, 2009. Because the Court agrees that damages prior to December 13, 2011 are barred, it is unnecessary to reach this issue.

10

Case: 2:05-cv-01039-ALM-TPK Doc #: 275 Filed: 09/20/12 Page: 11 of 24 PAGEID #: 11028

invalid in a subsequent action. *See* 402 U.S. at 334, 349–50. As this Court has recognized, "[c]ollateral estoppel may also operate to bar relitigation of common issues in actions involving *different but related* patents."[7] *Ohio Willow Wood Co. v. ALPS South, LLC*, No. 2:04–cv–1223, 2012 WL 2196083, at *8 (June 15, 2012) (emphasis in original) (citing *Mycogen Plant Science, Inc. v. Monsanto Co.*, 252 F.3d 1306, 1310 (Fed. Cir. 2001)); *see also Abbott Lab.*, 473 F.3d at 1207 ("[I]f the obviousness inquiry as to unadjudicated claims present identical issues to those already adjudicated in a prior suit in which other claims were found invalid, the patentee may be estopped from asserting the unadjudicated claims.") (citing *Bourns, Inc. v. United States*, 537 F.2d 486 (Ct. Cl. 1976)). Although the law of the regional circuit applies to general principles of collateral estoppel, the application of *Blonder-Tongue* is a matter of patent law, and, therefore the law of the Federal Circuit is binding in this area. *Pharmacia & Upjohn Co. v. Mylan Pharm., Inc.*, 170 F.3d 1373, 1381 n.4 (Fed. Cir. 1999); *see also CollegeNET, Inc. v. ApplyYourself, Inc.*, Nos. CV-02-484, CV-02-1359, 2008 WL 4793683, at *3 (D.Or. Oct. 28, 2008) ("While general principles of collateral estoppel are governed by the law of the regional circuit in patent cases, the more exacting issue of the effect of a prior determination of invalidity on current patent claims is one of patent law.").

As the Federal Circuit has noted, *Blonder-Tongue* allowed for defensive collateral estoppel when an accused infringer establishes:

> 1) [T]hat a patent was found invalid in a prior case that had proceeded through final judgment and in which all procedural opportunities were available to the patentee;

---

[7] *Ohio Willow Wood Co. v. ALPS South, LLC*, No. 2:04–cv–1223, involved the same parties, but a different patent. In a June 15, 2012 Opinion and Order, the Court considered whether the *Thermo-Ply* litigation collaterally estopped the patent claims at issue in that action.

11

2) *that the issues litigated were identical*; and 3) that the party against whom estoppel is applied had a full and fair opportunity to litigate.

*Abbott Lab.*, 473 F.3d at 1203 (emphasis added). With regard to the second element, requiring identical issues, the Court looks not to the "claims litigated[, but] instead [] to the issues that were decided." *Bourns*, 537 F.2d at 491. After all, " [t]he realities of patent practice suggest that, merely because the invention . . . is presented in varying language or varying combinations of elements does not necessarily mean that the issues bearing on the nonobviousness of that concept or contribution vary from one claim to the next." *Id.* at 492.

Consequently, when a court has invalidated prior related patent claims as obvious, this Court must look to the current unadjudicated claims and decide whether they present any new issues as to the obviousness analysis the Supreme Court established in *Graham v. John Deere Co.*, 383 U.S. 1, 17 (1966). *Westwood Chem., Inc. v. United States*, 525 F.2d 1367, 1375 (Ct. Cl. 1975). In other terms:

> [T]he inquiry should be whether the nonlitigated claims present new issues as to the art pertinent to the nonlitigated claims; as to the scope and content of that art; as to the differences between the prior art and the nonlitigated claims; and as to the level of ordinary skill in that art. If none of these inquiries raises any new triable issues, then the obviousness determination in the prior proceeding should be equally applicable to the nonlitigated claims.

*Id.*; *Bourns*, 537 F.2d at 492 ("[B]y focusing on the issues of fact and law necessary to a resolution of the obviousness issue . . . a determination can be made whether the unadjudicated claims present any new issues. . . .")

The United States Court of Claims has set forth a specific line of inquiry for determining whether collateral estoppel applies to the prosecution of a current unadjudicated patent claim

because of prior invalidity determinations concerning related claims.[8] *Westwood,* 525 F.2d at

1375. First, the Court must "compare the litigated and nonlitigated claims." *Id.* If the claims

are identical in scope, there are no new issues relevant to obviousness. As explained in

*Westwood*:

> On the other hand, such a comparison may reveal some differences of a substantive
> nature. In that event, it will be necessary to go a step further and determine whether
> those differences are of a kind that would have been itemized in a Graham analysis
> as a difference between the claim and the prior art, or whether it was known in the
> prior art and is only a part of the claimed combination as a whole that provides the
> context in which the obviousness determination is made. If it is only of the latter
> character, i.e., it is known in the prior art and does not alter the issue as to the
> differences between the claimed subject matter and the prior art, it is still necessary
> to assess the importance of the difference to the combination as a whole since it is
> from that standpoint that the obviousness determination must be made.

*Id.* This Court has summarized the latter portion of this inquiry as follows:

> In other words, even if the substantive differences identified by the patentee are
> disclosed in the prior art, collateral estoppel may not apply to invalidate the
> unadjudicated claims. "It is only where the claim comparison 'indicates that the
> additional elements recited in the unadjudicated claims do not distinguish the
> claimed combination as a whole from the prior art,' that those newly asserted claims
> may not be litigated in a subsequent proceeding." [*Medinol Ltd. v. Guidant Corp.*,
> 341 F. Supp. 2d 301, 315–16 (S.D.N.Y. 2004)] (quoting *Bourns*, 537 F.2d at 493);
> *see also Interconnect Planning Corp. v. Feil*, 774 F.2d 1132, 1137 (Fed.Cir.1985)
> (noting that the invention as a whole must be evaluated for obviousness); *Collegenet*,
> [2008 WL 4793683, at *18] (noting that collateral estoppel does not apply simply
> because additional elements are contained in prior art; court must determine whether
> additional elements raise "any new factual issues" when "viewed in combination
> with the rest of the claim").

*Ohio Willow Wood*, 2012 WL 2196083, at *9.

In this case, the Court finds that Alps has failed to establish that the claims in this case

present the same issues that were litigated in *Thermo-Ply*. First, in comparing the '182 patent

---

[8] The Federal Circuit has adopted, as precedent, the decisions of the earlier Court of
Claims. *Interconnect Planning Corp. v. Feil*, 774 F.2d 1132, 1136 n.2 (Fed. Cir. 1985).

claims litigated in *Thermo-Ply* with the '688 patent claims in this case, a number of differences are evident.  Of particular importance in this matter, all of the independent claims of the '688 patent require that the polymeric material coating the tube-sock shaped covering be "capable of forming an *air-tight seal* with the limb of the wearer . . . ."[9] '688 Patent col. 22 ll. 4–53 (emphasis added); (Mot. Summ. J. Intervening Rights Ex. 2, ECF No. 247-1).  All of the independent '182 patent claims at issue in *Thermo-Ply*, however, only required that the polymeric cushioning gel "*substantially conforms* to the shape of said amputation stump."[10]  *See, e.g.*, '182 Patent col. 14 ll.10–12 (emphasis added).  The Court finds it apparent that the requirement of an "air-tight seal" is significantly stricter than the "substantially conforms" language within the earlier claims.  Because the '688 patent claims go beyond the scope of '182 patent claims, by requiring an air-tight seal, there are substantive differences between the claims in question.  Notably, the *Thermo-Ply* court did not consider the requirement of air-tight seal in its obviousness analysis.  *See generally* 2009 WL 6499349.

Since there is at least one substantive difference that exists between the adjudicated and unadjudicated claims,[11] the Court must consider whether, in light of the *Graham* factors, this

---

[9]  The parties agree, for the purposes of claims construction, that "air-tight seal" means "an interface between two objects that substantially prevents the entrance and escape of air." (Joint Disputed Claim Terms Chart 2, ECF No. 263.)

[10]  Because all of the independent claims of the '688 and '182 patents contain these requirements, all of the dependent claims that follow do as well.  *See* 35 U.S.C. § 112 ("A claim in dependent form shall be construed to incorporate by reference all the limitations of the claim to which it refers.").

[11]  As discussed further below, the Court finds that Alps has failed to demonstrate that the requirement of an air-tight seal is insignificant to the obviousness analysis.  Given this conclusion, collateral estoppel is inappropriate.  Consequently, the Court finds it unnecessary to decide whether the other differences between the claims of the '688 and '182 patents are significant to the claimed combination as a whole.

difference is significant to the claimed combination as a whole.  Alps highlights two pieces of

evidence in an attempt to prove that the air-tight seal that the '688 patent claims recite was

disclosed in the prior art that the *Thermo-Ply* court considered.[12]  First, Alps contends that the

Klasson Patent already taught the use of an air-tight elastic material that conforms to the shape of

the amputation stump.  *See* Patent '474 col. 3 ll. 1–55.  Second, Alps maintains that OWW's

expert, John Michael, testified at this Court's April 2009 preliminary injunction hearing that

lubricant was put on the ICEROSS and that he believed the ICEROSS would have been capable

of forming an air-tight seal.  (Prelim. Inj. Tr. 288, ECF No. 120.)

This Court finds it questionable whether this evidence demonstrates that the air-tight seal

which the '688 patent claims recite was disclosed in the prior art before the *Thermo-Ply* Court.

The Klasson Patent certainly teaches the use of an air-tight elastic material to serve as a "second

skin" and reduce sliding between the sleeve and the skin.  *See* Patent '474 col. 3 ll. 1–55.  The

air-tight seal recited within the '688 patent, however, is formed between the polymeric material

and the residual limb, not the covering itself.  Additionally, the portion of Mr. Michael's

preliminary injunction testimony that Alps cites to, which was not before the *Thermo-Ply* Court,

offers limited detail on the subject, with Mr. Michael only stating that he believed ICEROSS

created an air-tight seal.  (Prelim. Inj. Tr. 288, ECF No. 120.)

---

[12]  In its Reply, Alps also presents U.S. Patent No. 4,822,371 as proof that using a polymeric material to form an airtight seal was well-known at the time of OWW's claimed invention.  (Reply Mot. Summ. J. Collateral Estoppel 10, ECF No. 257.)  It does not appear, however, that *Thermo-Ply* considered this prior art.  Accordingly, the Court finds it inapproriate to consider such art in conducting its collateral estoppel analysis.  *See Ohio Willow Wood*, 2012 WL 2196083, at *13 ("By going beyond the prior art considered by the *Thermo–Ply* court, ALPS has departed from arguing collateral estoppel and drifted into a discussion of the merits of the dependent claims.")

Even assuming the evidence sufficiently shows that the prior art the *Thermo-Ply* court considered disclosed an air-tight seal, this alone is not enough to demonstrate that the absence of new issues. Rather, "the court must determine whether the additional element(s), when viewed in combination with the rest of the claim, raises any new factual issues, reserved for the factfinder, as to whether the claimed combination as a whole is distinguishable from the prior art." *CollegeNET*, 2008 WL 4793683, at *18. This requirement is consistent with the general obviousness requirement that "even when all claim limitations are found in prior art references, the fact-finder must not only determine what the prior art teaches, but whether prior art teaches away from the claimed invention and whether there is a motivation to combine teachings from separate references." *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 655 F.3d 1364, 1374–75 (Fed. Cir. 2011).

Here, Alps fails to demonstrate that the addition of an air-tight seal to the claimed combination as a whole is insignificant to the obviousness analysis. *See Medinol*, 341 F. Supp. 2d at 325 (refusing to apply collateral estoppel in part because Defendant did not adequately show that the addition of the limitation in question "is insignificant to the overall combination"). Rather, the evidence before the Court indicates that the addition of an air-tight seal requirement is significant enough to warrant consideration on the merits. In particular, the '688 patent specification implies that the air-tight seal between the gel and the residuum is important to overcome problems with discomfort and unfortunate sound effects found in the prior products. *See* '688 Patent col. 2 ll. 25–47. Alps maintains, in conclusory fashion, that the addition of an air-tight seal to the claimed combination is "nothing more than adding a known technique to prior art . . . ." (Mem. Summ. J. Collateral Estoppel 18, ECF No. 252-1.) At best, however,

16

Alps has only shown that the Klasson patent—and its commercial embodiment—disclosed an air-tight seal. Alps fails to demonstrate sufficiently that the addition of this element, considered as a part of the claimed combination as a whole, was not inventive.

Under these circumstances, the Court is not convinced that the claims of the '688 patent present the same issues as the claims of the '182 patent which the *Thermo-Ply* court considered. Accordingly, collateral estoppel is inappropriate. Alps may prove correct that the addition of an air-tight seal is nothing more than an obvious application of a known technique. On the other hand, even assuming prior art discloses an air-tight seal, OWW's addition of this feature to the claimed combinations may prove novel. The Court must leave consideration of such issues, however, until adjudication on the merits.

### B. Absolute Intervening Rights

Alps also moves for partial summary judgment based on the doctrine of absolute intervening rights. "Although intervening rights originated as a defense against patents modified through reissue procedures, the doctrine has since been extended to the context of patent reexamination." *Marine Polymer Tech., Inc. v. HemCon, Inc.*, 672 F.3d 1350, 1361 (Fed. Cir. 2012). Specifically, 35 U.S.C. § 307(b) provides with regard to reexamination:

> Any proposed amended or new claim determined to be patentable and incorporated into a patent following a reexamination proceeding will have the same effect as that specified in section 252 of this title for reissued patents on the right of any person who made, purchased, or used within the United States, or imported into the United States, anything patented by such proposed amended or new claim, or who made substantial preparation for the same, prior to issuance of a certificate under the provisions of subsection (a) of this section.

35 U.S.C. § 307(b). Section 252 in turn provides:

> [E]very reissued patent shall have the same effect and operation in law, on the trial of actions for causes thereafter arising, as if the same had been originally granted in

17

such amended form, but in so far as the claims of the original and reissued patents are *substantially identical*, such surrender shall not affect any action then pending nor abate any cause of action then existing, and the reissued patent, to the extent that its claims are *substantially identical* with the original patent, shall constitute a continuation thereof and have effect continuously from the date of the original patent.

35 U.S.C. § 252 (emphasis added).

Combining these sections, "[a] patentee of a reexamined patent is entitled to infringement damages, *inter alia*, for the period between the date of issuance of the original claims and the date of issuance of the reexamined claims only if the reexamined claims are 'identical' to, i.e., 'without substantive change' from, the original claims." *Yoon Ja Kim v. Earthgrains Co.*, 451 F. App'x 922, 925 (Fed. Cir. 2011) (quoting *Laitram Corp. v. NEC Corp.*, 163 F.3d 1342, 1346 (Fed. Cir. 1998). On the other hand, "[i]f the patentee made substantive changes to the original claims, the patentee is entitled to infringement damages only for the period following the issuance of the reexamination certificate." *Id.* Accordingly, when amendments have occurred during reexamination, the critical issue is whether the claims are legally identical.

"There is no absolute rule for determining whether an amended claim is legally identical to an original claim." *Bloom Eng'g Co., Inc. v. North Am. Mfg. Co., Inc.*, 129 F.3d 1247, 1250 (Cir. Fed. 1997). The Federal Circuit has held, however, that " [r]eexamined claims are identical to their original counterparts if they are without substantive change." *Laitram*, 163 F.3d at 1346 (internal quotations omitted). Without substantive change requires that "the scope of the claims must be the same after [reexamination], not that the same words must be used." *Bloom*, 129 F.3d at 1250. Accordingly, "[d]etermination of whether a claim change during reexamination is substantive requires analysis of the scope of the original and reexamined claims." *Id.* The Federal Circuit has further suggested that the "mere clarification of language to make specific

18

what was always implicit or inherent" does not constitute substantive change. *Seattle Box Co., Inc. v. Indust. Crating & Packing, Inc.*, 731 F.2d 818, 828 (Fed. Cir. 1984). Conversely, the addition of limitations or requirements not present in the original claim typically signifies a substantive change. *See, e.g.*, *Bloom*, 129 F.3d at 1251 (concluding that the addition of a requirement designed to narrow the claims in question constituted a substantive change); *Yoon Ja Kim*, 451 F. App'x at 925–26 (holding that a district court did not err in finding substantive change where the patentee added a limitation to overcome prior art).

The "determination of whether the scope of a [reexamination] claim is identical with the scope of the original claim is a question of law . . . ." *Westvaco Corp. v. Int'l Paper Co.*, 991 F.2d 735, 741 (Fed. Cir. 1993); *cf. also Laitram*, 163 F.3d at 1347 ("This rule flows from the general principle that the interpretation and construction of patent claims, which define the scope of the patentee's rights under the patent, is a matter of law, exclusively for the court.") (internal quotations omitted). In analyzing the scope of the claims the Court must view the claims "in light of the specification, with attention to the references that occasioned the reexamination, as well as the prosecution history and any other relevant information." *Bloom*, 129 F.3d at 1250. "This inquiry, however, is circumscribed by the well-established principle that a court may not import limitations from the written description into the claims." *Laitram*, 163 F.3d at 1347. Finally, the Federal Circuit has "held that a claim amendment made during reexamination following a prior art rejection is not *per se* a substantive change." *Id.* Nevertheless, the Federal Circuit has remarked that "it is difficult to conceive of many situations in which the scope of a rejected claim that became allowable when amended is not substantively changed by the amendment . . . ." *Id.* at 1348.

19

Here, as detailed above, OWW amended its claims during the reexamination process in response to the examiner's rejection of various claims.  Specifically, OWW added to each independent claim the requirement of "*an adapter secured to said fabric at said closed end of said covering, said adapter for coupling said covering to a socket portion of a prosthesis*." ((Mot. Summ. J. Intervening Rights Ex. 2, ECF No. 247-2) (emphasis in original).)  Although the parties do not agree on the precise meaning of the word "adapter," both appear to agree that the term is narrower, or at the very least more specific, than the term "docking means" used within original claim.[13]  (*See* Alps Br. Claims Construction 17, ECF No. 264; Resp. Opp'n Mot. Summ. J. Intervening Rights 14, ECF No. 251.)

Examining the claim language, the Court finds it readily apparent that the majority of reexamination claims have substantially changed.  With the exception of original dependent claim 10, none of the claims of the '688 patent initially required an adapter.  *See* '688 Patent col. 22–26.  Once again, OWW admits that the term adapter is narrower than the term "docking means" that OWW originally included in claim 2.  (Resp. Opp'n Mot. Summ. J. Intervening Rights 14, ECF No. 251.)  Moreover, the original claims, with the possible exception of dependent claim 10, do not contain the additional requirements that the adapter be secured to the covering fabric at the closed end and serve to couple the covering the socket portion of a

---

[13]  The parties have briefed issues of claim construction and such matters are currently pending before the Court.  The Court recognizes that there are disagreements regarding the exact meaning of the terms "adapter," "[s]ecured to said fabric at said closed end of said covering," and "secured directly to said fabric."  (*See, e.g.*, Alps Br. Claims Construction 7–8, ECF No. 264.)  Neither party, however, maintains that claims construction is necessary for the Court to reach the issue of absolute intervening rights.  Under the specific circumstances of this case, and having reviewed the claims construction briefing, the Court does not find claims construction to be necessary in order to resolve the present matter.

prosthesis.  Tellingly, OWW concedes that it altered the scope of some of its claims during reexamination through the adapter amendment.  (Resp. Opp'n Mot. Summ. J. Intervening Rights 3, ECF No. 251.)  Furthermore, OWW only offers specific argument against absolute intervening rights with regard to current reexamination claim 2 ("amended claim 2"), in light of original dependent claim 10 ("prior claim 10" or "prior dependent claim 10").  Under these circumstances, the Court finds that the scope of independent claims 1, 3, 4, 5, 6, and 7 changed following reexamination.

Amended claim 2 presents a closer issue.  OWW maintains that amended claim 2 is identical in scope to prior dependent claim 10.  *See Bloom*, 129 F.3d at 1250 (holding that restating a dependent claim in independent form does not constitute a substantive change).  Prior claim 10 of the '688 patent recited a gel-coated covering with docking means that were "incorporated by attachment of an adapter to the outside of said covering." '688 Patent col. 22 ll. 65–67.  OWW maintains that viewing prior claim 10 in light of the entire specification makes clear that the requirements of amended claim 2 were inherently a part of prior claim 10.  For example, OWW contends that the figures, examples, and discussion of the '688 patent specification demonstrate that the adapter recited in claim 10 was located at the distal end of the covering.

Upon examination, however, the Court finds that amended claim 2 is substantially changed from prior claim 10.  Specifically, amended claim 2 contains at least one requirement not present within prior claim 10.  Amended claim 2, in addition to reciting an adapter, also requires that the adapter (1) be secured to the covering fabric, (2) be secured at the closed end of

the covering,[14] and (3) serve to couple the covering the socket portion of a prosthesis.  Even

assuming the first and third of these requirements were inherent within prior claim 10, the

second requirement was not.

A number of factors support this determination.  First, nothing in the plain language of

prior dependent claim 10 suggests that the adapter in question must be attached to the closed end

of the covering.  The language only indicates that the adapter must be somewhere on the outside

of the covering.  Furthermore, contrary to OWW's suggestion, the closed-end requirement was

not inherent in claim 10 based on the '688 patent specification.  Rather, in summarizing the

invention, the specification makes clear that the docking means "for coupling the liner to . . . the

hard socket of a prosthetic device" is "*preferably* at the distal end or side thereof" of the cushion

liner.  '688 Patent col. 3 ll. 40–45 (emphasis added); *see also Laitram*, 163 F.3d at 1348 ("[T]he

mere repetition in the written description of a preferred aspect of a claimed invention does not

limit the scope of an invention that is described in the claims in different and broader terms.").

Additionally, the fact that some figures and examples within the specification highlight the

possibility of placing the adapter at the distal end of the covering does not mean that such

placement was required under prior claim 10.  *See Computer Docking Station Corp. v. Dell, Inc.*,

519 F.3d 1366, 1374 (Fed. Cir. 2008) ("[T]his court will not countenance the importation of

claim limitations from a few specification statements or figures into the claims, . . . particularly if

those specification extracts describe only embodiments of a broader claimed invention . . . .").

---

[14]  The parties disagree as to the exact meaning of "secured to said fabric at said closed end of said covering . . . ."  (*See* Joint Disputed Claim Terms Chart 7–8, ECF No. 263.)  Both parties agree, however, that this language requires placement of the adapter at the distal end of the device.  (*Id.*)

Because claim 2, in its amended form, contains a limitation not present in the original claim 10, the claims are different in scope.  In other terms, current claim 2 is a narrower claim than prior claim 10 because it requires the adapter to be located at the closed end of the covering.  Accordingly, like the other independent claims within the reexamined '688 patent, claim 2 is substantially changed from the original '688 patent claims.

The prosecution history in this case provides at least some further support to the Court's conclusion that OWW's amended claims are different in scope.  During the reexamination process, concluding on December 13, 2011, the examiner rejected various claims of the '688 patent, including dependent claim 10, as obvious in light of prior art.  (*See* Mot. Summ. J. Intervening Rights Ex. 6, ECF No. 247-6.)   In response to these rejections, OWW amended all of its claims to include an adapter secured to the covering fabric at the closed end.  The examiner ultimately found such amendments persuasive in distinguishing OWW's claims from prior art.  (*See* Mot. Summ. J. Intervening Rights Ex. 5, ECF No. 247-5.)  Such circumstances suggest that OWW's reexamination amendments materially altered their claims.

Accordingly, because OWW substantially changed its claims during the reexamination process, the doctrine of absolute intervening rights applies.  Accordingly, pursuant to 35 U.S.C. §§ 252 and 307, OWW is barred from infringement damages prior to the date of the reexamination issuance, December 13, 2011.

## IV.  Conclusion

For the foregoing reasons, Alps' Motions for Summary Judgment on the Issue of

Collateral Estoppel are **DENIED**.  (ECF No. 79, 252.)  Alps' Motion for Partial Summary

Judgment on Absolute Intervening Rights Pursuant to 35 U.S.C. §§ 307 and 252 is **GRANTED**.

(ECF No. 247.)

**IT IS SO ORDERED.**

    <ins>  s/Algenon L. Marbley        </ins>
    **ALGENON L. MARBLEY**
    **UNITED STATES DISTRICT COURT**

**DATED:  September 20, 2012**